**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **LAILA AYOUB** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No:__________ |
| | ) | |
| | ) | |
| **TRANS UNION, LLC** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Laila Ayoub, by and through counsel, brings this Complaint against Defendant Trans Union, LLC. ("Defendant" or "Trans Union") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1. In December 2003 Congress enacted the Fair and Accurate Transactions Act of 2003 to amend the FCRA and provide important and additional relief for victims of identity theft. This amendment did not modify or replace the reinvestigation duty of a CRA pursuant to §1681i, but rather augmented and amplified a consumer's right to dispute and promptly correct fraudulent credit file data that resulted from identity theft. So long as a consumer provides the CRAs with proof of his/her identity, a police report of identity theft or an FTC Affidavit of identity theft together with a statement that the consumer had nothing to do with the fraudulent account, a CRA has four business days to block the disputed trade line data. This fast-track solution to identity theft mandated the immediate blocking of fraudulent accounts unless a CRA could "reasonably determine" that the dispute was itself fraudulent. Thus, if the CRA in the limited time provided (four business days) could muster proof that the consumer was not the victim of identity theft as stated, then it could decline to block. Blocking is not permanent and a CRA can always rescind

or reinsert the blocked/deleted credit file data if it reasonably determined later that it had blocked the trade line in error. The statute specifically authorized a CRA to rescind the block and reinsert the deleted data, if Trans Union could confirm that the information had been deleted in error and that the trade line did belong to the consumer. However, the intent and import of that amendment to the FCRA was that accounts disputed as fraud and supported by a police report or FTC affidavit should promptly be corrected and blocked. The amendment to the FCRA mandated that the consumer's disputes of identity theft had to be honored unless a CRA could prove (reasonably determine) that the consumer was lying and actually did open the account. This case exposes that rather than follow the law, Trans Union's outsourced processors in India will find any basis (regardless of whether it is authorized by the FCRA) to avoid blocking identity theft accounts or reinsert them without adequate proof. Upon information and belief, Trans Union makes up its own rules to prevent its processors from complying with §1681c-2. Despite a complete lack of proof that Ms. Ayoub had anything to do with these fraudulently opened accounts, Trans Union declined to block any of the disputed trade lines initially, deleted others later in time and then even reinserted accounts that had been deleted. Trans Union routinely tells consumers and courts that if the consumer files a police report or FTC affidavit that it will promptly block the trade line.[1] The circumstances show that what Trans Union represented to the court in the *Espinosa* matter was and is false, and the facts of Ms. Ayoub's case proves that completely. Ms. Ayoub submitted two dispute letters that qualified for immediate action (blocking) pursuant to §1681c-2, but both times

[1] "Specifically, under Section 1681c-2(a), a consumer reporting agency must delete an account if such documents have been provided. *Id.* As such, Trans Union's fraud policies and procedures required such theft documentation.8 Furthermore, Trans Union apprised Plaintiff on two occasions that he was required to submit fraud documentation and provided him with a Trans Union Identity Theft Victim Assistance Affidavit. Ex. 9 at TU 210-TU 218. Plaintiff chose not to provide any documentation supporting his claim. **Had he provided one of these three documents, Trans Union would have blocked the Upgrade account from his credit file before he applied for either the Rocket Mortgage pre-approval or the United Bank loan.**" *See* Ex. 18, Wagner Dep., at 124:19-125:12. TU Motion for S.J. *Espinosa v. Trans Union*, C/A 1:24-cv-0143 PTG-LRV Dkt. Ent. 69 (filed 8/.23/24). (emphasis added).

Trans Union failed to block the disputed trade lines. Not only does Trans Union fail to follow the FCRA when it comes to blocking fraudulent accounts, Trans Union's actions demonstrate it has adopted a policy that permits the reinsertion of previously deleted trade lines even if it cannot reasonably determine if the data had been blocked in error. These violations are blatant misrepresentations to consumers, the CFPB, and the federal courts are not negligent violations, but rather evidence of a knowing and intentional scheme to avoid taking required action on identity theft claims and complying with §1681i and §1681c-2. Accordingly, Ms. Ayoub requests an award of actual damages, statutory damages, punitive damages, attorney's fees, and costs based upon Trans Union's violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq*.

**Parties**

2. Plaintiff Laila Ayoub is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Laila Ayoub.

3. Defendant Trans Union, LLC (hereinafter "Trans Union"), is a foreign limited liability company with a principal office address in Illinois. Trans Union is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Trans Union regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

**Jurisdiction & Venue**

4. This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p). Venue is proper in this jurisdiction. The plaintiff lives and resides in the Eastern District of Virginia and has significant contacts with the Alexandria Division of the Eastern District of Virginia. Trans Union received and responded to consumer credit disputes directed from Virginia. Trans Union also transacts business in this district and division.

**Factual Allegations**

5. Laila Ayoub is a consumer that is the victim of identity theft.

6. In December 2019, Ms. Ayoub lived at a residence on Seminary Road in Alexandria, Virginia with her friend Orob Abu Abudahb.

7. While Ms. Ayoub lived with Orob Abu Abudahb, Ms. Abudahb was friends with an individual named Farid Khazan, who also resided within the same apartment complex on Seminary Road in Alexandria, Virginia.

8. While residing at the apartment, Ms. Ayoub's personal identifying information would have been present, and unscrupulous individuals could have obtained access to it.

9. In 2022, Ms. Ayoub departed the United States and returned to her home country of Jordan where she would ultimately be hospitalized.

10. Upon returning to the United States years later, Ms. Ayoub discovered that multiple consumer credit accounts had been opened using her personal identifying information during her absence. An identity thief used her personal information without Ms. Ayoub's knowledge, authorization, or consent.

11. Ms. Ayoub learned that two addresses became associated with her credit file despite the fact that she never resided at those addresses: 5593 Malone Ridge Street, Unit 7201, Alexandria, Virginia and 4380 King Street, Alexandria, Virginia.

12. Ms. Ayoub also learned that a telephone number with the last four digits 1270 had become associated with her consumer credit information and that phone number had never been her phone number.

13. In an effort to determine the details related to the theft of her identity, Ms. Ayoub investigated the unknown addresses and telephone number associated with her credit file.

14. As part of the investigation, Ms. Ayoub learned information that led her to believe that the unknown addresses were associated with Farid Khazan.

15. Ms. Ayoub had visited a T-Mobile retail location to inquire about the telephone number ending in the last four digits 1270. Based upon information and belief, the phone number was associated with an account connected to Elie Kourbaj which was also associated with an account that appeared connected to Farid Khazan.

16. As a result of these investigations, Ms. Ayoub believed that Farid Khazan may have been involved in the unauthorized use of her personal identifying information.

17. Based upon a review of her consumer credit files, Ms. Ayoub believed that as many as six credit accounts were opened using her personal identifying information without her authorization. There also appears to be at least one account in which Ms. Ayoub is identified as an authorized user for an account that she does not recognize.

18. Based upon the details of the accounts, some of the accounts appear to have been opened prior to Ms. Ayoub leaving the United States of America. These accounts may have been

opened to test whether credit could be successfully opened using Ms. Ayoub's personal identifying information.

19. As a result of the fraudulent accounts, Ms. Ayoub's credit reports contain inaccurate personal information, addresses, telephone numbers, and accounts that do not belong to her.

20. On April 8, 2026 Ms. Ayoub filed a police report with the Fairfax County police department about the theft of her identity. Fairfax County assigned a case number of 2026-0970033. The police provided a letter that identified the identity theft alleged, the Investigator assigned, and the accounts that were opened fraudulently.

21. On April 8, 2026, Ms. Ayoub also filed an Identity Theft Report with the Federal Trade Commission. The report included her personal statement about the identity theft, Ms. Ayoub's contact information, the accounts affected by the crime, and the suspected identity thief. Ms. Ayoub filed the report under penalty of perjury, which is the format provided by the Federal Trade Commission.

22. Ms. Ayoub mailed a credit dispute package to Trans Union dated April 15, 2026. Included in the package was a letter describing the identity theft, her identifying information, a list of the information that was identity theft related, and a copy of the FTC Identity Theft Report. What she disclosed in that letter was the fact that this identity thief was making payments on many of the accounts, that some were not reporting negatively and others were ones that she was only an authorized user as opposed to a co-obligor. She included a statement in the letter that she swore under penalty of perjury that she did not open the fraudulent account, nor received the benefits or funds from the account. The accounts she listed included: Capital One, Synchrony Bank, two Affirm accounts, two accounts with JP Morgan Chase, and an American Express account.

23. Ms. Ayoub accidentally omitted a copy of her driver's license and passport information in the April 15, 2026 credit dispute letter, so she mailed a second credit dispute package to Trans Union dated April 16, 2026. Included in the package was a letter describing the identity theft, a list of the information that was identity theft related, a copy of the front and back of her driver's license, a copy of the police report that she received from Fairfax County, a copy of the FTC Identity Theft Report, and a copy of her United States Passport information. This letter also included the facts that this identity thief was making payments on many of the accounts, that some were not reporting negatively and others were ones that she was only an authorized user as opposed to a co-obligor. She included a statement in the letter that she swore under penalty of perjury that she did not open the fraudulent account, nor received the benefits or funds from the account. The accounts she listed included: Capital One, Synchrony Bank, two Affirm accounts, two accounts with JP Morgan Chase, and an American Express account.

24. When Trans Union received the credit dispute package, Trans Union had two distinct and different statutory duties under the Fair Credit Reporting Act. One of the duties was to conduct a reasonable reinvestigation of the dispute under §1681i(a) with a second duty to block identity theft related account information under §1681c-2.

25. On April 23, 2026, Trans Union sent Ms. Ayoub correspondence notifying her that it received the fraud block request, and this letter identified Ms. Ayoub's Trans Union file identification number with the last four digits 4148. Trans Union told Ms. Ayoub that it had declined the fraud block request of three accounts identified on the police report: Synchrony, JP Morgan Card services, and Capital One. That letter and response to her identity theft blocking request made no mention or discussion of the other four: two Affirm Inc., the American Express, and the other JPMC account ending in 8634.

26. According to its April 23, 2026 correspondence, Trans Union declined to block those three: "because either the item reflected a history of previous payments made, a history of previous disputes, other than ownership, or was opened prior to when the fraud was reported to have occurred." What Trans Union failed to do in that letter was identify which one of those factors it was relying upon to decline to block.

27. In that April 23, 2026 letter, Trans Union did not notify Ms. Ayoub that there was any issue with her proof of identification or that there was anything unacceptable about either the police report or the FTC affidavit.

28. The April 23, 2026 letter went on to notify Ms. Ayoub that because of the discovery that three identified accounts: 'reflected a history of previous payments made, a history of previous disputes, other than ownership, or was opened prior to when the fraud was reported to have occurred" that Trans Union "determined" that "your block request **may** have been made in error; is a misrepresentation of material fact relevant to the request to block and/or you have obtained possession of good, services, or money as result of the transaction." (emphasis added).

29. The representation in that letter that one of those things "MAY" have occurred proves that Trans Union had not reasonably determined that any of them actually had occurred.

30. Trans Union's statement that Ms. Ayoub may have misrepresented a fact or that she obtained possession of good or services or money as a result of transaction was not based in fact. Prior to declining to institute the block (like it assured the court in *Espinosa* that it would do if the consumer had simply sent in the police report), Trans Union never actually reviewed any evidence regarding any of the transactions or accounts referenced in the credit dispute package.

31. Rather than conduct a real investigation, Trans Union arbitrarily decided to accuse Ms. Ayoub of making an error, misrepresenting facts, and/or getting the benefit of goods and services when it had no factual basis to support any of those allegations.

32. Trans Union's refusal to block the fraudulent accounts was not the result of a reasonable reinvestigation or any good faith evaluation of Ms. Ayoub's claims of identity theft.

33. Trans Union knew or should have known that falsely accusing a consumer of making a material misrepresentation is a serious determination that requires evidentiary support. Trans Union simply made those accusations without identifying any false statement by Ms. Ayoub, without identifying any contradictory evidence, and without possessing any reasonable basis to conclude that Ms. Ayoub participated in the fraudulent transactions.

34. Pursuant to §1681c-2, Trans Union had a duty and obligation to block all of the disputed accounts unless it could reasonably determine that the block was unwarranted.

35. On May 8, 2026 Trans Union sent Ms. Ayoub a results of reinvestigation letter in which it notified her that it had deleted the American Express account, the 4388 JPMC account (not the one that it had verified as hers) and the SYNCB/CRATE&BARREL (which it had claimed to have verified in the April 23, 2026 letter). It further disclosed that it had verified the other JPMC account beginning with 4266 as well as the Capital One account.

36. Trans Union failed to block any of the disputed accounts based upon her April 16, 2026 dispute letter.

37. Trans Union failed to block any of the disputed accounts, but well after the four-day period allotted it did modify and deleted all but two of the fraudulent accounts. Trans Union allowed the 4266 JPMC account and the 5178 Cap One account to remain.

38. Trans Union makes the rote and conclusory allegations identified in the letter about the identity theft to avoid compliance with the FCRA and knowing that it has no facts to support the allegations. Upon information and belief, Trans Union employs a blanket or automated process that denied Ms. Ayoub's request without any individualized review of the evidence. Such conduct reflects a reckless disregard for the rights afforded to consumers under the Fair Credit Reporting Act and demonstrates an unjustifiably high risk that Defendant's actions violated federal law. Trans Union also knows its actions run an unjustifiably high risk of harm because it is facing at least one class action lawsuit involving similar allegations.

39. As further demonstration of the rote practice of denying fraud block requests with no supporting facts obtained as part of a reinvestigation, Trans Union sent a second letter declining the fraud block request for additional accounts on April 29, 2026. This letter identified Ms. Ayoub's Trans Union file identification number with the last four digits 4570, which was different than the previous letter from April 23, 2026. The letter states that the accounts with Capital One, Synchrony, and JP Morgan Card services would not be blocked for identity theft. Once again Trans Union concluded with no facts that Ms. Ayoub inappropriately requested the block by stating, "your block request **may have been made in error**; is a misrepresentation of material fact relevant to the request to block and/or you have obtained possession of good, services, or money as result of the transaction." (emphasis added). The letter goes on to admit that Trans Union had no facts before making these allegations because it states that "it initiated an investigation into those accounts."

40. On May 8, 2026, Trans Union communicated the results of the reinvestigation to Ms. Ayoub. The May 8, 2026 letter identified the Trans Union file identification number with the last four digits 4148. Trans Union's letter stated that it reviewed her dispute and the supporting

documentation, which necessarily means that Trans Union reviewed the FTC report, the Fairfax County Police report, and the descriptive credit dispute letter. The letter indicated that an American Express account, JPMCB Card Services account with partial account number 438857618093, and a Synchrony account with Crate & Barrell were deleted from Ms. Ayoub's Trans Union credit file with the last four digits 4148. None of these three were blocked within four (4) days as mandated by §1681c-2.

41. In that same May 8, 2026 letter, Trans Union refused to delete the JPMCB Card services account with partial account number 426684178973 and a Capital One account from Ms. Ayoub's Trans Union credit file. Not only did Trans Union fail to block those two accounts, but it proceeded to verify that they belonged to Ms. Ayoub and were reporting accurately.

42. On May 12, 2026, Ms. Ayoub once again disputed the identity theft related accounts that Trans Union reported on her consumer credit file. Ms. Ayoub's credit dispute letter identified the accounts that she believed were related to the theft of her identity. Included among the accounts was the JPMC Card services account with partial account number 426684178973 and the Capital One account that Trans Union had refused to remove from her consumer credit file. The credit dispute package included a copy of Ms. Ayoub's driver's license, passport, social security card, Fairfax County police report, and FTC Identity Theft report. There was simply no reason for Trans Union not to immediately block and remove the identity theft related accounts identified in the letter.

43. On May 16, 2026, Trans Union sent another communication to Ms. Ayoub that stated Trans Union was declining to block the fraud request made by her as it related to the JPMC Card services account with partial account number 426684178973. Once again, Trans Union stated that it would decline to block the account because "we have determined" that "your block

request **may have been made** in error; is a misrepresentation of material fact relevant to the request to block and/or you have obtained possession of good, services, or money as result of the transaction." (emphasis added).

44. Contrary to §1681c-2(c), Trans Union declined to block the JPMC account without reasonably determining any of the three factors set forth in §1681c-2(c)(1)(A)-(C). Even its notification of its decision violated the statute in that it did not state that Trans Union had "reasonably determined" anything, much less one of the specific exceptions to blocking.

45. On May 16, 2026, Trans Union also sent Ms. Ayoub a copy of her Trans Union consumer file disclosure. This credit report contained the JPMCB Card services account with partial account number 426684178973 reporting as a derogatory account with a charged off status and $1,077 past due. The Trans Union file identification number for this communication ended with the last four digits 4148.

46. On May 16, 2026, Trans Union also sent a copy of the results of the reinvestigation. However, this communication contained the Trans Union file identification number with the last four digits 7570. At this point (well after the 4 business day time period to block fraudulent trade lines), Trans Union elected to delete the Capital One account and Synchrony Crate & Barrell account. Trans Union had previously stated that the Synchrony/ Crate & Barrell account had been deleted, so it is unclear why that account would have been reinserted by Trans Union on to Ms. Ayoub's credit report. In addition, Trans Union investigated the JPMCB Card services account with partial account number 426684178973 and updated the historical trended data.

47. On May 31, 2026 Trans Union sent Ms. Ayoub a results of reinvestigation letter in which it notified her that it was deleting the JPMC account.

48. Trans Union decided not to block the JPMC trade line because it **may have been** accurate, but two weeks later it decided to delete the trade line. This deletion proves that Trans Union did not reasonably determine on May 16, 2026 that it had sufficient evidence not to block the trade line.

49. On June 14, 2026 Trans Union reversed course again and sent Ms. Ayoub another letter in which it notified her that its reinvestigation was complete and it was reinserting the JPMC trade line with partial account number 438857618093 because it had been verified.

50. Trans Union did not have documents or evidence on or about June 14, 2026, to verify that Ms. Ayoub opened that JPMC account with partial account number 438857618093 or received the benefit of any of the funds from that account.

51. On or about June 14, 2026, Trans Union did not reasonably determine on its own that the JPMC account with partial account number 438857618093 was not opened by fraud as Ms. Ayoub had stated.

52. On or about July 2, 2026, Trans Union sent Ms. Ayoub yet another notice notifying her that a previously blocked account involving JPMCB Card Services with partial account number 426684178973 had been reinserted in her Trans Union consumer credit file. Trans Union's specific language was "This previously deleted item(s) has been verified; therefore, it has been added back to your credit report." Based upon information and belief, Trans Union conducted no independent analysis or reinvestigation prior to the reinsertion because CRAs like Trans Union simply engage in electronic communications where the furnisher instructs the CRA what action to take. This systemic procedure completely ignores both the federal law as it relates to the blocking of identity theft related accounts under 15 U.S.C. §1681c-2 and the reinvestigation requirements under 15 U.S.C. §1681i(a).

53. Trans Union knows that JP Morgan Chase Bank is one of the largest if not the largest furnisher of data to Trans Union. Trans Union will argue that this size makes it reliable, but the facts of this case indicate that Trans Union is simply going to do what its large furnisher wants it to do. Trans Union knows that if it pushed back on JP Morgan than it could lose a valuable source of data. Industry insiders have indicated that furnishers pressure CRAs at a higher level to restrict blocking of identity theft related accounts under §1681c-2 because the furnisher otherwise lacks a valid mechanism to collect the funds expended by the bank. Simply put, creditors do not want their account data deleted or blocked due to identity theft and pressure CRAs like Trans Union to decline to do so.

54. Ms. Ayoub was frustrated that Trans Union would not simply block and remove all of the identity theft related accounts from her credit file as required by federal law. Trans Union's failure to block and remove all of the identity theft related accounts from her Trans Union credit file was very distressing to Ms. Ayoub and caused worry, frustration, upset, and hurt her ability to obtain credit and apply for future extensions of credit.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681i**

55. Plaintiff incorporates paragraphs one (1) through fifty-four (54) as if fully stated herein.

56. Defendant Trans Union negligently and/or willfully violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681i, by failing to comply with its statutory duties after receiving Plaintiff's disputes concerning fraudulent and inaccurate information appearing on her consumer report. As a direct result of these violations, Trans Union is liable for actual damages

pursuant to 15 U.S.C. § 1681o and for statutory, punitive, and other available damages pursuant to 15 U.S.C. § 1681n.

57. Despite receiving detailed disputes, identity theft documentation, and supporting evidence demonstrating that the disputed accounts and personal identifying information did not belong to Ms. Ayoub, Trans Union failed to conduct the reasonable reinvestigation required by 15 U.S.C. § 1681i and instead continued reporting inaccurate information on Ms. Ayoub's consumer file.

58. Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Trans Union was required to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." Trans Union failed to conduct a reasonable reinvestigation of Ms. Ayoub's disputes. Upon information and belief, Trans Union relied upon cursory, automated, or otherwise inadequate procedures that were not reasonably designed to determine the accuracy of the disputed information and failed to meaningfully evaluate the evidence submitted by Plaintiff"

59. Pursuant to §1681i(a)(2), Trans Union was required to: "provide notification of the dispute to any person who provided any item of information in dispute." Discovery is necessary as to whether Trans Union complied with this statutory obligation.

60. Pursuant to 15 U.S.C. § 1681i(a)(4), Trans Union was required to "review and consider all relevant information submitted by the consumer" in connection with the disputed information. Plaintiff provided substantial documentation supporting her identity theft claims, including evidence demonstrating that the disputed accounts, addresses, and other identifying information were not hers. Trans Union failed to adequately review and consider this information and instead disregarded, ignored, or gave insufficient consideration to the evidence submitted by Plaintiff.

61. Trans Union deleted a number of disputed trade lines thereby verifying that Ms. Ayoub was the victim of identity theft, but refused to block the JPMC account.

62. Pursuant to 15 U.S.C. § 1681i(a)(5), if disputed information is determined to be inaccurate, incomplete, or cannot be verified, Trans Union must promptly delete, modify, or permanently block the information from the consumer's file. Despite the existence of substantial evidence demonstrating that the disputed information was inaccurate, incomplete, fraudulent, and/or incapable of verification, Trans Union failed to delete or modify the information and continued reporting it as accurate.

63. Pursuant to 15 U.S.C. § 1681i(a)(6), Trans Union was required to provide Plaintiff with written notice of the results of its reinvestigation within five business days after completing the reinvestigation. To the extent Trans Union provided such notice, the notices failed to accurately describe the nature, scope, and results of any reasonable reinvestigation and failed to adequately explain the basis upon which Trans Union continued reporting the disputed information. In addition, Trans Union misrepresents that it conducts a reinvestigation, but the reality is that Trans Union in the vast majority of instances outsources the reinvestigation to a third party that is not a credit reporting agency, Teleperformance. Trans Union never discloses that Trans Union does not conduct a reinvestigation and that it merely instructs a third-party vendor to issue an ACDV to a furnisher and thereafter have Trans Union's computer system parrot the results. The results of reinvestigation never disclose these key material facts to any consumer.

64. Trans Union violated 15 U.S.C. §1681i(a)(1) by its conduct related to Ms. Ayoub's disputes that it received as identified in the factual averments. With regards to the disputes, Ms. Ayoub informed Trans Union of the objectively verifiable facts that she was out of the country and that she did not open or authorize the identity theft related accounts. Thereafter, Ms. Ayoub

informed Trans Union of the identity theft, provided a detailed description of the identity theft, and provided police reports and an FTC Identity Theft affidavit. No reasonable reinvestigation would result in allowing any of the accounts to remain on her credit file.

65. The police report that Ms. Ayoub submitted did meet Trans Union's policies and procedures for blocking pursuant to §1681i and §1681c-2.

66. The FTC affidavit that Ms. Ayoub submitted did meet Trans Union's policies and procedures for blocking pursuant to §1681i and §1681c-2.

67. As part of the reinvestigations, Trans Union negligently and recklessly ignored how its own data corroborated what Ms. Ayoub told Trans Union about the identity theft. Moreover, Trans Union would ignore Ms. Ayoub's rights as a verified identity theft victim by not deleting the JPMC account as unverifiable given the information provided by her in conjunction with a verified victim policy that would have deleted all of the accounts at the same time.

68. As part of the reinvestigations, Trans Union negligently and recklessly ignored the Fairfax County Police Report even though it met all the requirements for validity and acceptance. In addition, Trans Union ignored the FTC identity theft report. Trans Union never identified one of the elements of §1681c-2(c) when it disregarded the report.

69. This type of reinvestigation is a sham, reckless, and/or negligent reinvestigation because Trans Union failed to conduct an independent reinvestigation as required by the FCRA. In the disputes, Ms. Ayoub identified the facts supporting the identity theft, the police report, and the FTC Identity Theft affidavit. No reasonable reinvestigation would have failed to consider the facts, the police report, and the fact that a proper reinvestigation would have discovered the facts that the loan was only digitally signed and there is no physical proof that loan documents were ever provided to Ms. Ayoub because of the invalid email address.

70. The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the consumer's credit dispute letter and unless it is able to verify said information Trans Union must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

71. According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate."

72. Based upon the circumstances, Trans Union knew that Ms. Ayoub alleged facts demonstrating that the accounts were opened by someone who stole her personal identifying information, knew she filed a police report, and knew that she filed an FTC Identity Theft affidavit, all of these facts were readily and objectively verifiable such that a reasonable credit reporting agency could permanently delete the accounts from her credit report.

73. Rather than undertake a more reasonable and detailed reinvestigation, Trans Union ignored the factual circumstances demonstrating identity theft and likely contracted for an outsourced third-party processor to issue a coded dispute to the various furnishers with Trans Union's computers "verifying" the information with no meaningful reinvestigation after receiving the ACDV response from the furnisher of the information.

74. Trans Union also violated 15 U.S.C. §1681i(a)(4) after receiving Ms. Ayoub disputes because it failed to review and consider the facts identified in the credit dispute letters

provided by Ms. Ayoub including the representations that an identity thief initiated the accounts and that she had filed an identity theft police report with the Fairfax County Police.

75. Because Trans Union uses outsourced third-party processors employed by Teleperformance, Trans Union incentivizes low-cost review at the expense of detailed review and consideration of the specific facts identified in the disputes. Upon information and belief, these processors are not provided with adequate training and supervision so that they can execute the functions of §1681i(a)(4) and (5). Moreover, Trans Union cannot possibly monitor the actions of the processors or take disciplinary action against the workers not performing to acceptable standards because the same issues arise consistently.

76. Trans Union wants to pay Teleperformance as little as possible to handle approximately 30 million disputes per year.

77. Trans Union has admitted to facts in the *Espinosa* litigation that equate to paying Teleperformance as little as $.12 per dispute investigation.

78. The only way that Trans Union can process so many disputes for so little money and potentially require the processors to handle at least 15 disputes per hour, is if it truncates their reinvestigation process and procedure. Based upon information and belief, the processors that handled these disputes were not allowed to conduct any legitimate investigation of the facts identified in the dispute letters and were merely instructed to look for documents that were attached and find any reason to not use them to correct the trade line. In this case the police report and FTC affidavit should have been accepted and used to delete or block all of the disputed trade lines.

79. Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of

§1681i(a)(5)(A), Trans Union automates that process and simply sends the ACDV response to its computer for automated updating and processing.

80. Based upon information and belief, after the processors concluded their processing, no other human reviewed the dispute and when the ACDV response was received back at Trans Union it was auto processed by the Trans Union computer system.

81. As a result, Trans Union fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange. Trans Union has been on notice from other reported decisions that parroting furnisher responses is not in compliance with the requirements of the FCRA.

82. Trans Union negligently and recklessly implemented a system with a total disregard for the requirements of §1681i(a)(5). Rather than allow these processors to review and consider the facts identified in the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Trans Union automates that process and simply sends the ACDV response to its computer for automated updating and processing.

83. Had the Trans Union processors been properly trained and supervised, they would have promptly completed their reinvestigation by deleting and blocking all the disputed trade lines. They also would not have issued deceptive and misleading letters that claimed that Trans Union would not block the disputed account because she may have taken acts that she never took.

84. Trans Union fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange without reasonably considering what information it had in front of it and what it could see was the cause of the disputed data.

85. If Trans Union determined that the information was too difficult to verify for purposes of the dispute, the proper response is to delete the information as unverifiable. Instead, Trans Union defaults to the furnisher's ACDV response no matter how ridiculous or inconsistent. Trans Union's uncritical deference to furnishers' ACDV responses to disputed information violates its independent reinvestigation obligations under the FCRA.

86. Ms. Ayoub suffered actual damage including time spent addressing the problem with Trans Union, time spent reviewing Trans Union documents and response letters, improper denial of access to credit, denial of credit on favorable terms, inability to use her credit, inconvenience, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are appropriate and necessary based upon Trans Union's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

87. Based upon information and belief and facts from other cases, Trans Union has a pattern and practice of failing to require the steps of a reasonable reinvestigation as required by the FCRA to circumvent its duties under the FCRA to conduct reinvestigations and keep the costs of dispute reinvestigations low. Trans Union's violations were willful because it acted in reckless disregard of its statutory obligations under the FCRA. Despite receiving detailed disputes, supporting documentation, and evidence of identity theft, Trans Union failed to follow the procedures mandated by Congress, failed to conduct a meaningful investigation of Plaintiff's claims, failed to review and consider all relevant information submitted by Plaintiff, and continued reporting information that it knew or should have known was unreliable, inaccurate, or incapable of verification.

88. Trans Union has been on notice of its failure to reinvestigate properly by virtue of other cases and court opinions, and only the imposition of substantial punitive damages will change

Trans Union's policies. Trans Union also knows that outsourced automated data conformity reviews do not comply with its grave responsibilities to assure maximum possible accuracy of consumer credit information.

**COUNT II**
**Fair Credit Reporting Act**
**15 U.S.C. §1681e(b)**

89. Plaintiff incorporates paragraphs one (1) through eighty-eight (88) as if fully stated herein.

90. Defendant Trans Union has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Trans Union is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

91. Trans Union willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Ms. Ayoub when it provided credit reports to Capital One and Wells Fargo on or about June 4, 2026. Discovery is necessary related to additional occasions on which Trans Union issued an inaccurate credit report.

92. Trans Union's publishing of inaccurate information was a substantial factor in the stress and strain from knowing that she was unable to qualify for credit on terms and in the manner requested. Trans Union allowed the inaccurate, misleading, derogatory identity theft related accounts to remain on Ms. Ayoub' credit report and included it in any credit information that her creditors had ordered from Trans Union.

93. Ms. Ayoub suffered actual damages including time spent addressing the problem with Trans Union, time spent reviewing Trans Union correspondence, inconvenience, improper denial of access to credit, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are necessary based upon Trans Union's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

94. Based upon its most recent decisions to reinstate the JPMC accounts, Trans Union is currently publishing or reporting inaccurate information in that it is reporting that Ms. Ayoub is responsible for the recently reinstated JPMC accounts.

95. Punitive damages are necessary because Trans Union has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Trans Union fails to invest the resources into enacting procedures to protect consumers or properly supervising these processors to ensure that they are carrying out and following Trans Union's existing procedures. Trans Union has implemented procedures to allow sham investigations, uncritical deference to furnisher responses to ACDVs, and inaccurate data to remain in its system that cannot be verified independently. Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

**COUNT III**
**Fair Credit Reporting Act**
**15 U.S.C. §1681c-2**

96. Plaintiff incorporates paragraphs one (1) through ninety-five (95) as if fully stated herein.

97. Defendant Trans Union willfully and/or negligently violated the Fair Credit Reporting by failing to comply with its statutory obligations under 15 U.S.C. § 1681c-2. As a result of these violations, Trans Union is liable to Plaintiff for actual damages pursuant to 15 U.S.C. §

1681o and for statutory, punitive, and other available damages pursuant to 15 U.S.C. § 1681n. Specifically, Trans Union failed to block the identity-theft-related accounts from Ms. Ayoub's consumer report within four business days despite receiving all documentation required by the FCRA to effectuate such a block. Trans Union misrepresented that it could decline the mandatory statutory block in multiple letters despite the fact that it did not have factual support for the reasons cited in declining the block.

98. 15 U.S.C. §1681c-2 specifically provides:

> (a)Block
> Except as otherwise provided in this section, a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of—
> (1)appropriate proof of the identity of the consumer;
> (2)a copy of an identity theft report;
> (3)the identification of such information by the consumer; and
> (4)a statement by the consumer that the information is not information relating to any transaction by the consumer.

99. Ms. Ayoub provided Trans Union with appropriate proof of her identity. She attached the front and back of her driver's license.

100. In her April 16, 2026 and May 12, 2026 dispute she included a copy of her driver's license, passport and social security card.

101. Ms. Ayoub provided Trans Union with a valid police report as well as an FTC Identity Theft Report each of which independently qualified as an identity theft report for purposes of 15 U.S.C. § 1681c-2.

102. Ms. Ayoub specifically identified the identity theft related accounts in her April 15, 2026, April 16, 2026 and May 12, 2026 dispute letters. Ms. Ayoub also specifically identified the accounts as fraudulent in her FTC Identity Theft Report and Police report provided with the credit dispute letters.

103. Ms. Ayoub stated in her April 15, 2026, April 16, 2026 May 12, 2026 dispute letters that: "I did not have anything to do with this loan, I did not receive any of the funds from it and I did not make any payments on it."

104. Pursuant to 15 U.S.C. §1681c-2(c)(1), a CRA may decline to block information only if it reasonably determines that the consumer's request is based on a material misrepresentation, made in error, or that the consumer obtained possession of the money at issue in the transaction.

105. Unless a CRA like Trans Union "reasonably determines" that the consumer misrepresented the facts or falsely claimed to be the victim of identity theft, it had to block and/or delete the disputed trade lines.

106. Trans Union never reasonably determined, based on any evidence, that Ms. Ayoub made any material misrepresentation of fact concerning the identity theft related accounts identified in the disputes.

107. Trans Union never reasonably determined, based on any evidence, that Ms. Ayoub's request for a block was made in error.

108. Trans Union did not reasonably determine that Ms. Ayoub obtained possession of the money at issue in any transaction related to any account.

109. Trans Union never reasonably determined, based on any evidence, that Ms. Ayoub obtained possession of any money, goods, services, or other benefit arising from any of the identity theft related accounts identified in the disputes.

110. Trans Union could not have determined that she opened or used these fraudulent accounts, because she was out of the country when the vast majority of the fraud was being committed.

111. If a CRA fails to determine a material misrepresentation, error, or receipt of goods, a CRA cannot decline a request to block without first requesting additional information from the consumer to determine the validity of the alleged identity theft. *See* 12 C.F.R. §1022.3(i)(1)(iii)(A).

112. "[I]f a CRA receives a police report containing detailed information as well as the signature, badge number, or other identifying information for the officer taking the report, it is not reasonable for the CRA to request additional information without 'an identifiable concern,' such as an indication that the report was fraudulent." *Osada v. Experian Info. Solutions, Inc.*, No. 11-C-2856, 2012 WL 1050067, at *3 (N.D. Ill. Mar. 28, 2012) (citing 16 C.F.R. § 603.3(c)(1) (renumbered at 12 C.F.R. § 1022.3(i)(3)(i)).

113. The plain language of Section §1681c-2 is clear and Trans Union is on notice of its requirements, both from guidance from the Federal Trade Commission and prior court decisions such as *Osada*.

114. Pursuant to §1681c-2(c)(2) a CRA has obligation to notify the consumer if it decides to decline to block a fraudulent account.

115. On April 23, 2026 Trans Union sent a letter to Ms. Ayoub notifying her that it received her Fraud Block request.

116. Based upon information and belief that April 23, 2026 letter was more than four (4) business days after receipt of her April 16, 2026 dispute letter.

117. The April 23, 2026 letter did not state that Trans Union declined to block the disputed trade lines because it reasonably determined that Ms. Ayoub had done any of the three reasons set forth in §1681c-2(c)(1). Instead, the letter said that because the trade lines in dispute

either reflected a history of previous payments made, a history of previous disputes, other than ownership, or was opened prior to when the fraud was reported to have occurred.

118. The April 23, 2026 letter to Ms. Ayoub did not identify which of the possible events it claims occurred or explain how those potential events (history of previous payments made, history of previous disputes or the account was opened prior to when the fraud was reported to have occurred) supported a reasonable determination of the three exceptions to blocking pursuant to §1681c-2(c)(1).

119. The April 23, 2026 letter went on to state the basis for the denial of the block request was that the three identified trade lines in her block request (SYNC/CRATE, JPMC, CAPITAL ONE) <u>**may have been made**</u> in error. (emphasis added). The letter did not state that Trans Union had reasonably determined that one of the three exceptions to blocking (§1681c-2(c)(1)) had been established or determined.

120. Not only did Trans Union fail to provide any notice to Ms. Ayoub as to the specific act pursuant to §1681c-2(c)(1) that justified it not blocking these three trade lines (it could have been any one of the three possible reasons), but it also made clear that it had not reasonably determined that any of the three exceptions had been determined. Instead, it hedged its allegations by only claiming that Ms. Ayoub **may have** falsely disputed the identity theft.

121. Not only did Trans Union fail to reasonably determine that Ms. Ayoub had improperly disputed these three accounts, but it admitted that she may not have done anything improper.

122. On April 29, 2026 Trans Union sent Ms. Ayoub a second "Fraud Block Request Denied" letter (more than 4 business days after her dispute letter was received) in which it repeated and renewed the same information.

123. Trans Union did not use Ms. Ayoub's police report and FTC fraud affidavit to block any of the disputed trade lines in violation of §1681c-2.

124. Trans Union failed to reasonably determine within the limited four business day time period that Ms. Ayoub actually had done any of the specifically enumerated three excuses for not blocking all the disputed trade lines.

125. On May 16, 2026 Trans Union sent Ms. Ayoub a letter concerning her second identity theft and fraud block request.

126. Just like the letters dated April 23 and 29, 2026, Trans Union declined to block all the disputed trade lines, but this time it only identified the JPMC that began with 4266 as one that it would not block. Using the same form letter, it claimed that either payments had been made on the account, there was a history of previous disputes or that the account was opened before the fraud was reported to have occurred.

127. Just like the letters dated April 23 and 29, 2026, Trans Union did not represent that it had reasonably determined that Ms. Ayoub had triggered any of the three blocking exceptions set forth in §1681c-2(c)(2). Instead, it once again intimated that she **may have done** any one of the three things that authorized a CRA to decline to block.

128. The outsourced dispute processors that handled Ms. Ayoub's identity theft and blocking request disputes, simply selected pre-packaged letters and instructed the Trans Union system to generate these letters and mail them to Ms. Ayoub. These were not letters specifically drafted based on Mrs. Ayoub's circumstances but rather a systemic computer-generated letter.

129. Trans Union directs and intends its dispute processors to decline to block disputed trade lines and merely issue ACDVs to the furnishers of the disputed information.

130. In violation of the FCRA, Trans Union willfully and negligently declined to block the reporting of information that Ms. Ayoub alleged to have resulted from identity theft in violation of 15 U.S.C. §1681c-2(a) despite its receipt of the required documentation from her.

131. Trans Union failed to comply with the requirements of §1681c-2(c) for not blocking a disputed trade line when the consumer provided the required items pursuant to §1681c-2(a) and on multiple occasions (April 15, 2026 and May 12, 2026) falsely responded that it was not blocking the accounts because she failed to provide all the required elements for the blocking statute and when she did provide them a second time, it repeated the same misleading and deceptive behavior.

132. Despite the fact that Trans Union represented to this court in the *Espinosa v. Trans Union*, C/A 1:24-cv-0143 PTG-LRV case at Dkt. Ent. 69 (Memo in Support of Trans Union's Summary Judgment at page 27 filed 8/.23/24) that: "Had he provided one of these three documents, Trans Union would have blocked the Upgrade account from his credit file before he applied for either the Rocket Mortgage pre-approval or the United Bank loan. *See* Ex. 18, Wagner Dep., at 124:19-125:12.," it did the exact opposite here not once, but twice.

133. Ms. Ayoub complied with all of the statutory requirements for a block of the identity theft related accounts. Rather than comply with the statute, Trans Union allowed the identity theft related accounts to remain on Ms. Ayoub's credit file. These were verifiable facts that Trans Union simply ignored.

134. Based upon information and belief, Trans Union declined to delete any of the disputed trade lines because payments had been made on some of them.

135. Trans Union knows that just because payments are made on a trade line does not mean that the account was not opened by fraud and/or identity theft.

136. In her dispute letter Ms. Ayoub made clear that there had been payments made on some of the accounts, but that she did not make them.

137. Trans Union did delete most of her disputed accounts but refused to delete the JPMC account despite the facts that Ms. Ayoub met all the requirements of §1681c-2.

138. On May 31, 2026 Trans Union sent Ms. Ayoub a letter that looked like a results of reinvestigation letter in which it notified her that it had finally decided to delete the JPMC trade line. Trans Union did not say why it deleted the JPMC account, just that it had deleted it.

139. On June 14, 2026 Trans Union sent Ms. Ayoub another letter that looked like a results of reinvestigation letter, but this time it notified her that the previously deleted JPMC account had been added back to her credit report.

140. On or about June 14, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had opened the JPMC beginning with 4388.

141. On or about June 14, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had falsely requested that the JPMC account beginning with 4388 be deleted or blocked due to fraud.

142. On or about June 14, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had had obtained possession of goods, services or money as a result of the blocked JPMC account beginning with 4388.

143. Other than a notice and request from JPMC, Trans Union did not have any other information or evidence to support a claim that Ms. Ayoub had anything to do with the JPMC account beginning with 4388.

144. On July 2, 2026 Trans Union sent Ms. Ayoub another letter that looked like a results of reinvestigation letter, but this time it notified her that the previously deleted JPMC account beginning with account number 4266 had been added back to her credit report.

145. On or about July 2, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had opened the JPMC beginning with 4266.

146. On or about July 2, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had falsely requested that the JPMC account beginning with 4266 be deleted or blocked due to fraud.

147. On or about July 2, 2026, Trans Union did not have any documentation that proved that Ms. Ayoub had had obtained possession of goods, services or money as a result of the blocked JPMC account beginning with 4266.

148. Other than a notice and request from JPMC, Trans Union did not have any other information or evidence to support a claim that Ms. Ayoub had anything to do with the JPMC account beginning with 4266.

149. Trans Union is believed to have established a policy and procedure that allows previously disputed trade lines to be reinserted if the furnisher requests that Trans Union do so.

150. Trans Union does not independently determine based upon facts or documents or information unrelated to the furnisher of the disputed trade line data that the previously deleted trade line should be reinserted.

151. As a result of the violation, Ms. Ayoub suffered actual damages including time spent addressing the problem with Trans Union, time spent reviewing Trans Union correspondence, inconvenience, improper denial of access to credit, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are necessary

based upon Trans Union's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

**Prayer for Relief**

Wherefore, the Plaintiff prays that the Court award the following relief:

a) Actual damages based upon Defendant's violations of the FCRA;

b) statutory damages against Defendant's based upon violations of the FCRA;

c) punitive damages based upon the violations of the FCRA

d) costs and reasonable attorneys' fees incurred by the Plaintiff;

e) prejudgment interest

f) all other further relief that this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand trial by jury as to all issues against the defendant.

Respectfully submitted,
Laila Ayoub

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582